# UNITED STATES *v.* MORRISON.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 138. Argued December 15, 1916.—Decided February 21, 1916.

The State of Oregon did not, under § 4 of the Act of February 14, 1859, c. 33, 11 Stat. 383, take title to sections 16 and 36, thereby granted prior to survey; but, until defined by survey and title had vested in the State, Congress had power to dispose of them on compensating the State for the resulting deficiency.

Surveying the public lands is an administrative act, confided by statute

to designated officers of the United States who have power to direct how the surveys shall be made; and, until all requirements shall have been fulfilled, a survey is not a completed official act.

Nothing in the Act of February 14, 1859, or in Rev. Stat., § 2275, as amended by the Act of February 28, 1891, operated to pass title to the State of Oregon of sections 16 and 36 at any intermediate stage of the survey, or imposed any limitations on the authority of Congress to dispose of such lands before title passed to the State upon a survey duly completed according to authorized regulations of the Land Department.

A survey is incomplete until formally approved by the Commissioner; and even though approved without modification it does not so relate back to the date of the grant or of the field survey as to destroy the power of Congress to dispose of the land while unsurveyed.

Authority to establish the Cascade Range Forest Reservation given to the President by the Acts of March 3, 1891, and June 4, 1897, included the power to make temporary withdrawals, and a properly made order of the Secretary of the Interior withdrawing lands must be regarded as an act of the President.

The disposition of public lands by the President under the authority of Congress is a disposition by Congress.

The exception in the proclamation of January 15, 1907, enlarging the Cascade Range Forest Reserve did not include sections 16 and 36 in townships in Oregon referred to in § 4 of the Enabling Act of 1859 but which had not been included in a completed survey.

The statutory provisions for forest reservations refer to any lands which are subject to disposition of Congress whether surveyed or not.

*Quære* whether a State may await the extinguishment of a forest reserve which includes lands granted, but title to which will not vest until completed survey, and after such extinguishment take the granted lands.

212 Fed. Rep. 29, reversed.

THE facts, which involve the construction of provisions in Federal statutes relating to sections 16 and 36 granted to the State of Oregon, are stated in the opinion.

*Mr. Mark Norris,* with whom *Mr. Oscar E. Waer* and *Mr. Richard Sleight* were on the brief, for appellees:

The grant was a grant *in præsenti. Ham* v. *Missouri,* 18 How. 126; *Beecher* v. *Wetherby,* 95 U. S. 517; *United States* v. *Thomas,* 151 U. S. 577, 583; *Alabama* v. *Schmidt,*

232 U. S. 168; *United States* v. *Tully*, 140 Fed. Rep. 904; *Heydenfeldt* v. *Daney*, 93 U. S. 634; *Minnesota* v. *Hitchcock*, 185 U. S. 373; *Wisconsin* v. *Hitchcock*, 201 U. S. 202; *St. Paul* v. *Northern Pacific*, 139 U. S. 5; *United States* v. *Oregon & Calif. R. R.*, 176 U. S. 28; *Butz* v. *Northern Pacific*, 119 U. S. 55; *Southern Pacific* v. *United States*, 168 U. S. 1; *United States* v. *Southern Pacific*, 146 U. S. 570; *Menotti* v. *Dillon*, 167 U. S. 703; *Mo., Kan. & Tex. Ry.* v. *Cook*, 163 U. S. 191; *N. Y. Indians* v. *United States*, 170 U. S. 1; *Wright* v. *Roseberry*, 121 U. S. 488, 501; *Tubbs* v. *Wilhoit*, 138 U. S. 134; *Rogers Locomotive Works* v. *Emigrant Co.*, 164 U. S. 559, 570; *Chandler* v. *Mining Co.*, 149 U. S. 79, 91; *French* v. *Fyan*, 93 U. S. 169; *Martin* v. *Marks*, 97 U. S. 345; *Railroad Co.* v. *Smith*, 9 Wall. 95; *Rice* v. *Sioux City R. R.*, 110 U. S. 695; *Mich. Land Co.* v. *Rust*, 168 U. S. 589, 591.

If the grant was not *in præsenti*, title vested when the field survey was made. *Cooper* v. *Roberts*, 18 How. 173; *Hibberd* v. *Slack*, 84 Fed. Rep. 571.

If title had not vested upon the completion of the field survey, it did vest upon its approval by the surveyor general of Oregon. Endlick on Interp. Stat. (ed. 1888, § 85); *Platt* v. *Un. Pac. R. R.*, 99 U. S. 48, 63; *Smith* v. *Townsend*, 148 U. S. 490; *M. & O. R. R.* v. *Tennessee*, 153 U. S. 486, 502; *Dewey* v. *United States*, 178 U. S. 510, 520; *Burfenning* v. *Railroad*, 163 U. S. 323; *United States* v. *George*, 228 U. S. 14; *Daniels* v. *Wagner*, 237 U. S. 547; *Smelting Co.* v. *Kemp*, 104 U. S. 636, 646; *Wright* v. *Roseberry*, 121 U. S. 488, 519; *Doolan* v. *Carr*, 125 U. S. 618; *Davis* v. *Weibbold*, 139 U. S. 507, 529; *Knight* v. *U. S. Land Ass'n*, 142 U. S. 161.

The official use of the plat as filed in the General Land Office constituted an approval of it, which binds the United States. *Wright* v. *Roseberry*, 121 U. S. 488, 501; *Tubbs* v. *Wilhoit*, 138 U. S. 134, 144; *Cooper* v. *Roberts*, 18 How. 173.

Immediately upon the formal approval of the survey, the statutory reservation and grant originally made to Oregon destroyed the effect of the temporary withdrawal and vested title in the State. *Burfenning* v. *Railroad Co.,* 163 U. S. 323; *United States* v. *George,* 228 U. S. 14; *Daniels* v. *Wagner,* 237 U. S. 547; *Smelting Co.* v. *Kemp,* 104 U. S. 636, 646; *Wright* v. *Roseberry,* 121 U. S. 488, 519; *Doolan* v. *Carr,* 125 U. S. 618; *Knight* v. *U. S. Land Ass'n,* 142 U. S. 161.

The lands had not been sold or otherwise disposed of when the survey was formally approved on January 31, 1906, and title therefore vested in the State of Oregon on that date, if not before. *Ham* v. *Missouri,* 18 How. 126; *Connelly* v. *State,* 85 Georgia, 348; *Platt* v. *Un. Pac. R. R.,* 99 U. S. 48; *Roberson* v. *State,* 100 Alabama, 37; *Maxwell* v. *State,* 140 Alabama, 131.

The alleged executive withdrawal of these lands made December 16, 1905, was of no force. *Wolsey* v. *Chapman,* 101 U. S. 769; *Wilcox* v. *Jackson,* 13 Pet. 498; *United States* v. *Blendauer,* 122 Fed. Rep. 703; *Newhall* v. *Sanger,* 92 U. S. 761, 763; *Bardon* v. *Nor. Pac. Ry.,* 145 U. S. 535; *Barker* v. *Harvey,* 181 U. S. 481, 490; *Un. Pac. R. R.* v. *Harris,* 215 U. S. 338; *Barnard* v. *Ashley,* 18 How. 43; *Hosmer* v. *Wallace,* 97 U. S. 575; *Buxton* v. *Traver,* 130 U. S. 232.

The presidential proclamation of January 25, 1907, was of no force as far as the lands in question were concerned because (a) the proclamation did not affect these lands and (b) the proclamation expressly excepted the lands. *Bardon* v. *Nor. Pac. R. R.,* 145 U. S. 535; *Railroad* v. *Roberts,* 152 U. S. 114; *United States* v. *Blendauer,* 122 Fed. Rep. 703.

*Mr. Assistant Attorney General Knaebel,* with whom *Mr. S. W. Williams* was on the brief, for the United States.

MR. JUSTICE HUGHES delivered the opinion of the court.

The United States brought this suit to quiet title to lands in section 16, township 3 south, range 6 east, Willamette Meridian, Oregon. By the Act of February 14, 1859 (c. 33, 11 Stat. 383), for the admission of Oregon into the Union, it was provided (§ 4):

"That the following propositions be, and the same are hereby, offered to the said people of Oregon for their free acceptance or rejection, which, if accepted, shall be obligatory on the United States and upon the said State of Oregon, to wit: First, That sections numbered sixteen and thirty-six in every township of public lands in said State, and where either of said sections, or any part thereof, has been sold or otherwise been disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools. . . . *Provided, however*, That in case any of the lands herein granted to the State of Oregon have heretofore been confirmed to the Territory of Oregon for the purposes specified in this act, the amount so confirmed shall be deducted from the quantity specified in this act."

The propositions of the Enabling Act were accepted by the legislative assembly of the State of Oregon on June 3, 1859. 1 Lord's Oregon Laws, pp. 28, 29.

There was a stipulation of facts, in substance, as follows:

Prior to May 27, 1902, no survey of any kind had been made by the United States of the lands in question. On June 2, 1902, a field survey was made under the direction of the United States surveyor general of Oregon. This officer approved the survey on June 2, 1903, and on June 8, 1903, transmitted copies of plat of survey and filed notes to the Commissioner of the General Land Office. On October 13, 1904, the Commissioner informed the surveyor general that the deputy had failed to describe

the kind of instrument used in the execution of the work or to record any polaris or solar observations at that time, and that a supplemental report would be necessary. Additional field notes were transmitted to the Commissioner on September 8, 1905. The Commissioner accepted the survey on January 31, 1906. In view of reports of illegal settlement, it was directed that no entries should be allowed until further permission, as the survey was accepted 'for payment only.' The plat was received in the local land office on February 7, 1906. On November 16, 1907, the suspension was revoked and the surveyor general of Oregon was directed to place the plat on file in the local land office, and it was filed accordingly in substantially the same form in which it had been accepted by the surveyor general 'without change or correction.'

On December 16, 1905, the Secretary of the Interior "temporarily withdrew for forestry purposes from all forms of disposition whatsoever, except under the mineral laws of the United States, all the vacant and unappropriated public lands" within described areas which include the land in controversy. Notice of this withdrawal was given on December 19, 1905, to the register and receiver of the local land office. In taking this action the Secretary of the Interior and the Commissioner described the lands 'according to the rectangular system of Government survey.' On January 25, 1907, the President issued a Proclamation enlarging the Cascade Range Forest Reserve so as to include the section sixteen in question and other lands. This proclamation, by its terms, excepted "all lands which at this date are embraced within any withdrawal or reservation for any use or purpose to which this reservation for forest uses is inconsistent." 34 Stat. 3270.

It was the contention of the Government that, by reason of the withdrawal by Executive Order for forestry purposes prior to the acceptance of the survey by the

Commissioner of the General Land Office, the title to the lands did not pass to the State under the school grant. The appellees claimed title under a conveyance from the State, its certificates of sale having been executed on October 10, 1906, and its deed on January 9, 1907. Decree in favor of the United States (*United States* v. *Cowlishaw*, 202 Fed. Rep. 317) was reversed by the Circuit Court of Appeals (*Morrison* v. *United States,* 212 Fed. Rep. 29), and the Government appeals to this court.

The first enactment for the sale of public lands in the western territory provided for setting apart section sixteen of every township for the maintenance of public schools (Ordinance of 1785; *Cooper* v. *Roberts*, 18 How. 173, 177); and, in carrying out this policy, grants were made for common school purposes to each of the public-land States admitted to the Union. Between the years 1802 and 1846 the grants were of every section sixteen,[1] and, thereafter, of sections sixteen and thirty-six.[2] In some instances, additional sections have been granted. In the case of Oregon, the following provision had been made in establishing the Territorial Government (Act of August 14, 1848, c. 177, § 20, 9 Stat. 323, 330):

"That when the lands in the said Territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each

---

[1] Ohio (2 Stat. 175); Louisiana (2 Stat. 394, 5 Stat. 600); Indiana (3 Stat. 290); Mississippi (2 Stat. 234, 10 Stat. 6); Illinois (3 Stat. 430); Alabama (3 Stat. 491); Missouri (3 Stat. 547); Arkansas (5 Stat. 58); Michigan (5 Stat. 59); Florida (5 Stat. 788); Iowa (5 Stat. 789); Wisconsin (9 Stat. 58).

[2] California (10 Stat. 246); Minnesota (11 Stat. 167); Oregon (11 Stat. 383); Kansas (12 Stat. 127); Nevada (13 Stat. 32); Nebraska (13 Stat. 49); Colorado (18 Stat. 475); North Dakota, South Dakota, Montana, and Washington (25 Stat. 679); Idaho (26 Stat. 215); Wyoming (26 Stat. 222), Utah (28 Stat. 109); Oklahoma (34 Stat. 272); New Mexico (36 Stat. 561); Arizona (36 Stat. 572).

township in said Territory shall be, and the same is hereby, reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be erected out of the same."

In 1850, Congress created the office of surveyor-general of the public lands in Oregon, and provided for survey and for donations to settlers (Act of September 27, 1850, c. 76, 9 Stat. 496, 499) and this act provided (§ 9): "That no claim to a donation right . . . upon sections sixteen or thirty-six, shall be valid or allowed, if the residence and cultivation upon which the same is founded shall have commenced after the survey of the same." By the Act of February 19, 1851, § 1, c. 10 (9 Stat. 568), Congress authorized the legislative assemblies of the Territories of Oregon and Minnesota "to make such laws and needful regulations as they shall deem most expedient to protect from injury and waste sections numbered sixteen and thirty-six . . . reserved in each township for the support of schools therein."    In 1853 (Act of Jan. 7, 1853, c. 6, 10 Stat. 150) the legislative assembly of Oregon was authorized "in all cases where the sixteen or thirty-six sections, or any part thereof, shall be taken and occupied under the law making donations of land to actual settlers" to select, "in lieu thereof, an equal quantity of any unoccupied land in sections, or fractional sections, as the case may be."    And these provisions were followed in 1859 by the proposition of the Enabling Act *(supra)* accepted by the State of Oregon that these sections 'in every township of public lands' within the State, and 'where either of said sections, or any part thereof, has been sold or otherwise been disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools.'

Prior to survey, the designated sections were undefined and the lands were unidentified.    It is insisted by the

appellees that there was a grant *in præsenti*, under which
the State acquired a vested right in the lands subject
only to identification which would relate back to the date
of the grant, and that "any sale or disposal" subsequent
to that date "was illegal and void." It will be observed,
however, that the language used is not that of a present
grant. The expression is "shall be granted," and these
words are used both with respect to the described sec-
tions and to the undefined indemnity lands which would
be received in compensation for losses. In the latter
case, there was obviously no present grant and none we
think was intended in the former. Attention is called
to the words 'herein granted' in the proviso of the En-
abling Act, but this is a mere reference to what precedes
and does not change, or purport to change, the terms of
the donation. It must have been manifest to Congress,
executing this definite policy with respect to the vast
area of the public lands, that not improbably a long
period would elapse in the case of numerous townships
before surveys would be completed. Not only was it
inevitable that upon survey there would be found to be
fractional townships in which there would be either no
section sixteen, or thirty-six, or only a portion of one
or the other, but in various instances there might be prior
claims, or actual settlements, or it might appear before
surveys were had that there were important public inter-
ests which in the judgment of Congress should be sub-
served by some other disposition of lands of a particular
character. On the other hand, it was not important to
the State that it should receive specific lands, if suitable
indemnity were given. It was in this situation that,
in making its school grants to the public-land States,
Congress provided that the described sections, or equiva-
lent lands if the former in whole or in part had 'been
sold or otherwise been disposed of,' should be granted.
Whether or not provision had already been made for

the sale or disposition of public lands within the borders of the State at the time of its admission, the language of the school grant was substantially the same. And we think that its import is clear. The designation of these sections was a convenient method of devoting a fixed proportion of public lands to school uses, but Congress in making its compacts with the States did not undertake to warrant that the designated sections would exist in every township, or that, if existing, the State should at all events take title to the particular lands found to be therein. Congress did undertake, however, that these sections should be granted unless they had been sold or otherwise disposed of; that is, that on the survey, defining the sections, the title to the lands should pass to the State provided sale or other disposition had not previously been made, and, if it had been made, that the State should be entitled to select equivalent lands for the described purpose.

By the Act of May 20, 1826, c. 83 (4 Stat. 179), there had been provision made for compensation in the case of townships, and fractional townships, for which the stated appropriation for school purposes had not been made. In 1859, a further act was passed (Feb. 26, 1859, c. 58, 11 Stat. 385) to the effect that where settlement with a view to preëmption had been made "before the survey of the lands in the field" on sections sixteen or thirty-six, these sections should "be subject to the preëmption claim of such settler." And it was added,—"if they, or either of them, shall have been or shall be reserved or pledged for the use of schools or colleges in the State or Territory in which the lands lie, other lands of like quantity are hereby appropriated in lieu of such as may be patented by preëmptors; and other lands are also hereby appropriated to compensate deficiencies for school purposes where said sections sixteen or thirty-six are fractional in quantity, or where one or both are wanting by

reason of the township being fractional, or from any natural cause whatever." These lands were to be selected in accordance with the principles of adjustment defined in the Act of 1826. These provisions were incorporated in §§ 2275 and 2276 of the Revised Statutes. And the latter were amended by the Act of February 28, 1891, c. 384 (26 Stat. 796), which in part provided: "And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said State or Territory, where section sixteen or thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States." In this manner, Congress has undertaken to discharge its obligation by assuring to the States the equivalent of the school grant sections when these have 'been sold or otherwise been disposed of.'

The question now presented was not involved in *Ham* v. *Missouri*, 18 How. 126, or in *Cooper* v. *Roberts*, 18 How. 173. The former case related to the school grant to Missouri under the Act of March 6, 1820 (c. 22, 3 Stat. 545, 547). Ham had been indicted for waste and trespass on the sixteenth section of one of the townships, and his conviction was affirmed. In defense, he claimed title under a Spanish grant. This had been rejected by the Board of Commissioners in 1811, and it appeared that the United States had full power of disposition at the time of the donation to the State. Referring to the provision for the grant of equivalent lands, to take the place of those "sold or otherwise-disposed of," the court said: "Sale, necessarily signifying a legal sale by a competent authority, is a disposition, final and irrevocable, of the land. The phrase 'or otherwise disposed of' must signify some disposition of the property equally efficient, and equally incompatible with any right in the State, present or potential, as deducible from the Act of 1820, and the ordinance of the same year." But in the case cited there

had been no such disposition. Reliance was placed by Ham upon an act of May 24, 1828 (6 Stat. 386) confirming the grant to his predecessors, but this confirmatory act explicitly provided that it should not "prejudice the rights of third persons, nor any title heretofore derived from the United States, either by purchase or donation." And it further appeared that the survey had been made of the land in question before the confirmatory act was passed (see 18 How., p. 134). In *Cooper* v. *Roberts, supra,* the plaintiff asserted title under the school grant made to Michigan (Act of June 23, 1836, c. 121, 5 Stat. 59). The section sixteen in controversy had been surveyed in 1847. Sale had been made by the State in February, 1851, and its patent had issued in November of that year. It was in 1850, after the lands had been surveyed, that the defendant's grantor had applied to the officers of the land office to enter the land, and the entry was allowed in 1852 with a reservation of the rights of Michigan, which the Secretary of the Interior deemed to be superior. It was in these circumstances, it being found that there was no legal impediment through any legislation, that the court held that the title had passed to the State.

In the case of *Heydenfeldt* v. *Daney Gold &c. Co.*, 93 U. S. 634, there had been a disposition of the land under the authority of Congress between the date of the school grant and the date of the survey. This case arose under the school grant to Nevada (Act of March 21, 1864, c. 36, 13 Stat. 30, 32), which was one of the exceptional instances where words of present grant were used, these however being qualified by the clause relating to sale or other disposition. The act provided: "That sections numbers sixteen and thirty-six, in every township, and where such sections have been sold or otherwise disposed of by any act of Congress, other lands equivalent thereto . . . shall be, and are hereby, granted to said State for the support of common schools." The plaintiff claimed under a patent

issued by the State of Nevada in 1868. The land was mineral land, and the defendant was in possession, carrying on the mining business, having obtained a patent from the United States under the acts of July 26, 1866 (c. 262, 14 Stat. 251), as amended, and May 10, 1872 (c. 152, 17 Stat. 91). The entry and claim of the defendant's predecessors in interest were made in 1867 prior to the survey of the section in question. It was held that the lands were subject to the disposition of Congress until the survey and its approval; and hence the judgment in favor of the defendant was affirmed. The words of present grant were deemed to be restricted by the words of qualification. The court said that it was intended to place Nevada "on an equal footing with States then recently admitted. Her people were not interested in getting the identical sections 16 and 36 in every township. Indeed, it could not be known until after a survey where they would fall,—and a grant of quantity put her in as good a condition as the other States which had received the benefit of this bounty. A grant, operating at once, and attaching prior to the surveys by the United States, would deprive Congress of the power of disposing of any part of the lands in Nevada, until they were segregated from those granted. In the meantime, further improvements would be arrested, and the persons, who prior to the surveys had occupied and improved the country, would lose their possessions and labor, in case it turned out that they had settled upon the specified sections. . . . . Until the *status* of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them; and if in exercising it the whole or any part of a 16th or 36th section had been disposed of, the State was to be compensated by other lands equal in quantity, and as near as may be in quality. By this means the State was fully indemnified, the settlers ran no risk of losing the labor of years, and Congress was left

free to legislate touching the national domain in any way it saw fit, to promote the public interests."

It is said that the Nevada school grant added the words "by any act of Congress" to the phrase "otherwise. disposed of," and that the former words are not in the Oregon grant. But this does not mark a distinction, as "otherwise disposed of," of course, implies that the disposition shall be by competent authority. It is also urged that the court emphasized the fact that there had been no sale or disposition of the public lands in Nevada prior to the Enabling Act and therefore that the clause could refer only to future disposition; whereas, in the case of Oregon, there had been earlier provisions for the disposal of the public domain. But Congress used the same phrase substantially in nearly every one of the school grants, and it was the manifest intention to place the States on the same footing in this matter. The same clause, relating to the same subject, and enacted in pursuance of the same policy, did not have one meaning in one grant and a different meaning in another; it covered other dispositions, whether prior or subsequent, if made before the land had been appropriately identified by survey and title had passed. Nor is a distinction to be observed between mineral lands and other lands, if in fact Congress disposed of them. The validity of the disposition would not be affected by the character of the lands, although this might supply the motive for the action of Congress. We regard the decision in the *Heydenfeldt Case* as establishing a definite rule of construction.

In opposition to this definition of the effect of the donation for school purposes, the appellees rely upon what was said in *Beecher* v. *Wetherby*, 95 U. S. 517. That was an action of replevin to recover logs cut on a section sixteen in Wisconsin which had been granted by the Enabling Act of Aug. 6, 1846 (c. 89, 9 Stat. 56, 58). The exterior lines of the township in which the land was

situated were run in October, 1852, and the section lines in May and June, 1854; and the defendant claimed under patents from the State issued in 1865 and 1870. The land had been occupied by the Menominee Indians, but their right was only that of occupancy. "The fee was in the United States, subject to that right, and could be transferred by them whenever they chose." By the treaty of 1848 (9 Stat. 952) these Indians agreed to cede to the United States all their lands in Wisconsin, it being stipulated that they should be entitled to remain on the lands for two years. In view of their unwillingness to withdraw, a further act was passed (10 Stat. 1064) by which a tract was assigned to them embracing the land in controversy. Subsequently, a portion of this reservation was assigned by another treaty to the Stockbridge and Munsee tribes, and for the benefit of the latter Congress passed the Act of February 6, 1871 (16 Stat. 404, c. 38) providing for the sale of certain townships. The plaintiff asserted title under patents issued by the United States in 1872 pursuant to this act. It appeared, however, that the Indian occupation of the land had ceased before the logs were cut. The court held that the title had vested in the State and hence that the plaintiff had acquired no title by his patents from the United States. It was said in the opinion that by the compact with the State (the school grant) the lands were "withdrawn from any other disposition, and set apart from the public domain, so that no subsequent law authorizing a sale of it could be construed to embrace them, although they were not specially excepted"; and that after this compact "no subsequent sale or other disposition .. . . . could defeat the appropriation." But it was also stated that "when the logs in suit were cut, those tribes (Stockbridge and Munsee) had removed from the land in controversy; and other sections had been set apart for their occupation." That is, the lands had been surveyed in 1854; prior to

that time, there had been no other disposition of the fee by the United States; the title had vested in the State subject at most to the Indian occupancy, and this had terminated. There was abundant reason for the decision that these lands were not embraced, and were not intended to be embraced, in the provisions for sale made by the Act of 1871. What was said in the opinion must be considered in the light of the facts (*Weyerhaeuser* v. *Hoyt*, 219 U. S. 380, 394). The *Heydenfeldt Case* was not cited and cannot be regarded as overruled. See *New York Indians* v. *United States*, 170 U. S. 1, 18; *Minnesota* v. *Hitchcock*, 185 U. S. 375, 399–401.

The rule which the *Heydenfeldt Case* established has, we understand, been uniformly followed in the land office. After reviewing the cases, Secretary Lamar concluded (December 6, 1887; to *Stockslager, Commissioner*, 6 L. D. 412, 417) that the school grant "does not take effect until after survey, and if at that date the specific sections are in a condition to pass by the grant, the absolute fee to said sections immediately vests in the State, and if at that date said sections have been sold or disposed of, the State takes indemnity therefor." And see, to the same effect, *Niven* v. *California*, 6 L. D. 439; *Washington* v. *Kuhn*, 24 L. D. 12, 13; *California* v. *Wright*, Id. 54, 57; *South Dakota* v. *Riley*, 34 L. D. 657, 660; *South Dakota* v. *Thomas*, 35 L. D. 171, 173; *F. A. Hyde*, 37 L. D. 164, 166; to *Atty. Gen. of Montana*, 38 L. D. 247, 250.

The case of *United States* v. *Thomas*, 151 U. S. 577, involved the Wisconsin school grant, the question being whether the Federal court in that State had jurisdiction to try an Indian charged with the murder of another Indian within the limits of section sixteen in a township forming part of an Indian reservation. It appeared that by treaty prior to the Enabling Act of 1846 the Indians had stipulated for the right of occupancy; that they had never been removed from the lands; and that, by treaty

of 1854, the particular reservation in question had been established. The lands were not surveyed until 1855. From any point of view it was clear that the title had never vested in the State, except as subordinate to the right of occupation of the Indians, and it was held that the Federal jurisdiction existed. *Minnesota* v. *Hitchcock, supra,* was a suit brought by the State to enjoin the Secretary of the Interior from selling any sections sixteen and thirty-six in the Red Lake Indian Reservation, the sales having been authorized by the Act of January 14, 1889 (c. 24, 25 Stat. 642) which was passed for the relief of the Chippewa Indians. The school grant to Minnesota was made by the Enabling Act of Feb. 26th, 1857 (c. 60, 11 Stat. 166, 167). The lands in question, however, were not surveyed until after the Act of 1889 had been passed and the agreement it contemplated had been made with the Indians. The court dismissed the bill of the State. It was held that when Congress undertook in 1889 "to make provision for this body of lands it could have by treaty taken simply a cession of the Indian rights of occupancy, and thereupon the lands would have become public lands and within the scope of the school grant"; but that Congress also "had the power to make arrangements with the Indians by which the entire tract would be otherwise appropriated. . . . Before any survey of the lands, before the state right had attached to any particular sections, the United States made a treaty or agreement with the Indians, by which they accepted a cession of the entire tract under a trust for its disposition in a particular way." The *Heydenfeldt Case* was cited with approval. Referring to the joint resolution passed by Congress on March 3, 1857 (c. 12, 11 Stat. 254) to the effect that in case of settlements on the sixteenth or thirty-sixth sections, their selection as town sites, or their reservation for public uses prior to survey, other lands should be selected in lieu thereof,

and to the contention of the State that the 'public uses' thus contemplated were 'governmental uses,' the court said: "It is unnecessary to rest upon a determination of this question. We refer to the resolution as an express declaration by Congress that the school sections were not granted to the State absolutely, and beyond any further control by Congress, or any further action under the general land laws. As in *Heydenfeldt* v. *Daney Gold &c. Co., supra,* priority was given to a mining entry over the State's school right, so here, in terms, preference is given to private entries, town-site entries, or reservations for public uses. In other words, the act of admission with its clause in respect to school lands, was not a promise by Congress that under all circumstances, either then or in the future, these specific school sections were or should become the property of the State. The possibility of other disposition was contemplated, the right of Congress to make it was recognized, and provision made for a selection of other lands in lieu thereof. In this connection may also be noticed the Act of February 28, 1891, although passed after the approval of the agreement for the cession of these lands by the Indians. That act in terms authorized the selection of other lands 'where sections sixteen or thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States.

The case of *Wisconsin* v. *Hitchcock,* 201 U. S. 202, followed *United States* v. *Thomas, supra,* and *Minnesota* v. *Hitchcock, supra.* In *Alabama* v. *Schmidt,* 232 U. S. 168, there was no question as to the acquisition of title by the State. It was held that, assuming that the State had acquired title to the lands embraced in the school grant, it had authority to subject the lands in its hands to the ordinary incidents of other titles in the State, including that of adverse possession.

We conclude that the State of Oregon did not take title to the land prior to the survey; and that until the sections were defined by survey and title had vested in the State, Congress was at liberty to dispose of the land, its obligation in that event being properly to compensate the State for whatever deficiencies resulted.

The remaining question, then, is whether there had been a survey prior to an authorized withdrawal for forestry purposes. The surveying of the public lands is an administrative act confided to the control of the Commissioner of the General Land Office under the direction of the Secretary of the Interior. Act of July 4, 1836 (c. 352, 5 Stat. 107); Rev. Stat., § 453. It was competent for the Commissioner, acting within this authority, to direct how surveys should be made and to require that they should be subject to his examination and approval before they were filed as officially complete in the local land office. *Cragin* v. *Powell*, 128 U. S. 691, 697, 698; *Tubbs* v. *Wilhoit*, 138 U. S. 134, 143, 144; *Knight* v. *U. S. Land Association*, 142 U. S. 161, 177, 182; *Michigan Land Co.* v. *Rust*, 168 U. S. 589, 594. This was a continuing authority which was not suspended by the school grant to the State. The subsequent adoption of rules relating to surveys did not alter the terms of the grant, but these rules did control the administrative action which in view of the terms of the grant was necessary to make the grant effective. By order of April 17, 1879, the Commissioner required that surveyors-general should not "file the duplicate plats in the local land offices until the duplicates have been examined in this office and approved" and the surveyors-general "officially notified to that effect." 37 L. D. 165. It cannot be doubted that this requirement was within the authority of the Commissioner (see *Tubbs* v. *Wilhoit, supra*); and it necessarily follows that the making of the field survey and its ap-

proval by the surveyor-general of Oregon did not make the survey complete as an official act. It still remained subject to the examination and approval of the Commissioner, and for that purpose copies of the plat of survey and field notes were transmitted to the Commissioner who, not being satisfied, required a supplemental report. The matter was still in abeyance when the lands in controversy were withdrawn for forestry purposes by the Secretary of the Interior on December 16, 1905. Reference is made to the terms of the Territorial Act of 1848 (*supra*) with respect to the reservation of the described sections when the lands were "surveyed . . . preparatory to bringing the same into market," but this provision furnishes no ground for the contention that an incomplete and unapproved survey was intended. Much less can it be said that under the grant of the Enabling Act of 1859 the title would pass at any intermediate stage of the survey. Nor is there merit in the contention that is based on § 2275 of the Revised Statutes as amended by the Act of February 28, 1891 · (*supra*), protecting settlements when made "before the survey of the lands in the field." That act imposes no limitation upon the authority of Congress to dispose of the lands before title passes to the State; and if title passes upon survey, it must be upon a survey duly completed according to the authorized regulations of the Department. It is said, however, that in this case the plat was officially used by the Commissioner of the General Land Office and the Secretary of the Interior in connection with the withdrawal under consideration, and hence that the survey must be deemed to have been officially approved: *Wright* v. *Roseberry*, 121 U. S. 488, 517; *Tubbs* v. *Wilhoit, supra.* It is true that the lands withdrawn were conveniently described according to townships and that the official correspondence referred to an accompanying diagram showing the townships and sections. But neither the

correspondence nor the diagram contained any reference to a survey of the lands in question or constituted an approval of a survey. These lands still remained to be officially defined in the appropriate manner and according to the agreed statement the survey was accepted by the Commissioner of the General Land Office, as stated, on January 31, 1906, and was filed in the local land office on November 16, 1907, entries during the interval having been suspended pending certain investigations. We think that it is immaterial that the survey was finally approved by the Commissioner without modification, for pending the approval it remained in his hands, officially incomplete, awaiting the result of his examination. Again, it is urged that the survey when approved related back to the date of the grant or at least to the date of the survey in the field. The former contention is but a restatement in another form of the argument that Congress could not dispose of the land pending the survey which as we have seen is answered by the terms of the grant; and if Congress had this power of disposition, it must mean that the lands could be disposed of under the authority of Congress at any time before the survey became a completed administrative act. The doctrine of relation cannot be invoked to destroy this authority.

In establishing and enlarging the Cascade Range Forest Reserve, the President acted under the express authority conferred by the Acts of March 3, 1891, c. 561, § 24 (26 Stat. 1095, 1103), and June 4, 1897, c. 2 (30 Stat. 11, 36). The power to establish the permanent reservation included the power to make temporary withdrawals (*United States* v. *Midwest Oil Co.*, 236 U. S. 459, 476); and the order of the Secretary of the Interior made on December 16, 1905, must be regarded as the act of the President. *Wilcox* v. *Jackson*, 13 Pet. 498. The disposition by the President, under the authority of Congress, was a disposition by Congress.

It is finally contended that the Proclamation by the President on January 25, 1907, expressly excepted the lands in question. The exception was "of all lands which at this date are embraced within any withdrawal or reservation for any use or purpose to which this reservation for forest uses is inconsistent." The evident purpose of the Proclamation was to confirm and make permanent the prior withdrawal for forestry purposes, not to override it. The very object of that withdrawal was to prevent claims of title from thereafter attaching to the lands. And the reference in the exception to 'any withdrawal or reservation,' as we view it, was to withdrawals or reservations by the Government itself for other and inconsistent uses and was with a view of avoiding confusion in governmental action, not to let in subsequently accruing claims of title under school grants as to which Congress had indicated its purpose to make compensation for deficiencies when lands which otherwise would have passed to the State thereunder had been duly taken for reservations. The contention that the lands were not 'public lands' until surveyed and hence were not subject to reservation by the President under the act of Congress is plainly without basis. See Rev. Stat., § 453. The provision for forest reservations refers to any part of the public lands which were subject to the disposition of Congress. It is also argued that the State under the Act of February 28, 1891 (*supra*), has the right to await the 'extinguishment' of the 'reservation' and the 'restoration of the lands therein embraced to the public domain,' and then to take the described sections. We are not called upon to consider any such question here, and we express no opinion upon it, as there has been no extinguishment of the reservation, and from any point of view it must be concluded that no title had passed to the State when it made the conveyance under which the appellees claim.

The decree of the Circuit Court of Appeals is reversed and that of the District Court is affirmed.

*It is so ordered.*

Mr. Justice McReynolds took no part in the consideration and decision of this case.