[Nos. 15595, 15596. *En Banc.* March 24, 1920.]

# L. L. Thompson, *as Attorney General, Appellant,* v. C. V. Savidge, *as Commissioner of Public Lands, Respondent.*[1]

Courts (38) — Federal Questions — Congressional Grants. Whether the school land grants to the states were grants *in praesenti*, vesting title to unsurveyed lands as well as surveyed lands, is a Federal question upon which the decision of the United States supreme court is controlling.

Public Lands (34-37)—Indemnity and Lieu Lands—Authority to Relinquish—Statutes. Rev. St. U. S., §§ 2275, 2276, and Laws of Wash. 1913, p. 300, authorized the relinquishment by the state of school sections 16 and 36 in national forest reservations and the selection of other lands in lieu thereof, pursuant to the agreement therefor entered into between the commissioner of public lands and the secretary of the interior.

Same (34)—School Land Grants—Power to Modify Restrictions. Congress has power to modify the conditions of the grant of school land sections 16 and 36, so far as it contained restrictions upon their disposal by the state.

Same (34-37)—School Land Grant—Disposal—Relinquishment and Selection of Lieu Lands. The state's relinquishment of its right to unsurveyed school sections 16 and 36 which did not vest and had not since vested in the state because of national forest reservations or settlers' claims initiated before survey, is not a disposition of granted lands, in violation of the restrictions of Const., art. 16, §§ 1 and 2.

Same (34)—Grant of School Lands—Grant in Praesenti. The school land grant to the state of Washington on its admission whereby sections 16 and 36 "are hereby granted" to the state, is not a grant *in praesenti* vesting title in the state prior to the identification thereof by the government survey.

Appeal from judgments of the superior court for Thurston county, Wright, J., entered September 21, 1919, dismissing, on the pleadings, actions to prohibit the commissioner of public lands from making lieu land selections. Affirmed.

[1]Reported in 188 Pac. 397.

*The Attorney General,* for appellant.

*W. V. Tanner,* for respondent.

PARKER, J.—These actions were commenced in the superior court for Thurston county by the plaintiff, as *Attorney General* for the state, seeking judgments of that court prohibiting the defendant, as commissioner of public lands for the state, from selecting from the public lands of the United States, subject to disposition, lands in lieu of unsurveyed school land sections sixteen and thirty-six, and portions thereof, which, when identified upon the ground by government surveys, will be found to be within national forest reservations set apart by proclamation of the President; and also prohibiting the defendant, as commissioner of public lands for the state, from selecting from the public lands of the United States subject to disposition, lands in lieu of school land sections sixteen and thirty-six, and portions thereof, lying within national forest reservations set apart and reserved from disposition by proclamation of the President, which sections and portions thereof have become lost to the state, as it is claimed, by preemption and homestead entries initiated by settlement thereon prior to the survey of such lands, and prior to their inclusion in forest reservations.

The cases were submitted to the superior court together for final decision, upon the facts appearing in the pleadings, as to which there is no dispute. Judgments were rendered denying to the *Attorney General* the relief prayed for and dismissing the actions with prejudice. From these judgments, the *Attorney General* has appealed to this court.

The claim for relief sought by the *Attorney General* was, in the superior court, as it is here, rested upon the theory that the school land grant of sections six-

teen and thirty-six in each township, made by the national government to this state upon its admission into the Union, vested absolute title *in praesenti* of all such lands as completely and effectively as if they had then all been identified upon the ground by government surveys; that such title in the state cannot be impaired by any subsequent legislative or executive act of the national government; that no state officer has lawful authority, and cannot be granted lawful authority by the state legislature, in view of the restrictions upon the manner of disposition of the granted lands by the state, to be found in the act of Congress making the grant, and the state constitution, to surrender the state's claim to the lands here in question, as is, in effect, sought to be done by the proposed selection of other lands in lieu thereof.

On December 22, 1914, the commissioner of public lands, acting for the state, entered into an agreement with the Secretary of Agriculture, acting for the Federal government, he being lawfully in charge of the national forest reservations, which agreement, in so far as we need here notice its terms, reads as follows:

"It is agreed between the Department of Agriculture of the United States of America, through D. F. Houston, the Secretary of Agriculture, and the state of Washington, through Clark V. Savidge, its commissioner of public lands, with the consent and approval of the board of state land commissioners and the attorney general of said state, acting under and pursuant to chapter 102, of the laws of Washington for 1913, that the following plan of adjustment be adopted to the end that the state of Washington may satisfy deficiencies of lands granted to the state for common school purposes (sections 16 and 36), occasioned by the inclusion of such lands prior to survey thereof within the national forests and the Olympic National Monument in said state, and by homestead settlements thereon prior to survey and inclusion

within the reservations named, and that the details of such plan are to be worked out as soon as practicable.

"First. In order to carry out the plan above expressed, it is agreed that a representative be appointed by the Secretary of Agriculture and a representative be appointed by the board of state land commissioners of the state of Washington and that such representatives shall make, with such assistance as may be necessary (a) an examination upon the ground of all school sections within the above named reservations unsurveyed at the time of the establishment of such reservations, excepting those which have already been relinquished to the United States as a basis for the selection of lieu lands; and (b) an examination upon the ground of all school sections within such reservations upon which settlements were made prior to survey and inclusion within such reservations and have not been abandoned, for the purpose of determining the value and area thereof, and shall report their findings to the Secretary of Agriculture and the commissioner of public lands for final approval.

"Second. Such representatives shall also make an examination upon the ground of lands equivalent in area and value to the school sections mentioned in paragraph one hereof lying within the present boundaries of the National Forests of the state of Washington in such position that when eliminated therefrom all will lie outside the new exterior boundaries of such forests, to the end that upon such elimination such lands may be available for selection in lieu of the lands mentioned in paragraph one hereof. It is agreed that the lands to be eliminated for selection by the state shall include an area sufficient to compensate the state as nearly as possible for areas, if any, lost through the existence of fractional school sections resulting from the public land surveys within such reservations."

This agreement was duly approved by the board of state land commissioners, and the then *Attorney General* of the state. Chapter 102 of the Laws of 1913, p. 300, the authority by which the commissioner of

public lands entered into the agreement, reads as follows:

"Section 1. For the purpose of obtaining from the United States indemnity or lieu lands for such lands granted to the state for common schools, educational, penal, reformatory, charitable, capitol building or other purposes, as have been or may be lost to the state, or the title to or use or possession of which is claimed by the United States or by others claiming by, through or under the United States, by reason of any of the causes entitling the state to select other lands in lieu thereof, the inclusion of the same in any reservation by or under authority of the United States, or any other appropriation or disposition of the same by the United States, whether such lands are now surveyed or unsurveyed, the commissioner of public lands, with the advice and approval of the board of state land commissioners and the attorney general, is authorized and empowered to enter into an agreement or agreements, on behalf of the state, with the proper officer or officers of the United States for the relinquishment of any such lands and the selection in lieu thereof, under the provisions of this act, of lands of the United States of equal area and value.

"Sec. 2. Upon the making of any such agreement, the board of state land commissioners shall be empowered and it shall be their duty to cause such examination and appraisal to be made as will determine the area and value, as nearly as may be, of the lands lost to the state, or the title to, use or possession of which is claimed by the United States by reason of the causes mentioned in section 1 of this act, and proposed to be relinquished to the United States, and shall cause an examination and appraisal to be made of any lands which may be designated by the officers of the United States as subject to selection by the state in lieu of the lands aforesaid, to the end that the state shall obtain lands in lieu thereof of equal area and value.

"Sec. 3. Whenever the title to any lands selected under the provisions of this act shall become vested in the state of Washington by the acceptance and approval of the lists of land so selected, or other proper

action of the United States, the governor, on behalf
of the state of Washington, shall execute and deliver
to the United States a deed of conveyance of the lands
of the state relinquished under the provisions of this
act, which deed shall convey to and vest in the United
States all the right, title and interest of the state of
Washington therein.

"Sec. 4.  For the purpose of carrying out the pro-
visions of this act, the sum of thirty thousand dollars
($30,000), or so much thereof as may be necessary,
is hereby appropriated from the general fund to be
disbursed upon vouchers approved by the commis-
sioner of public lands."

The plan of adjustment contemplated by the agree-
ment is now proceeding towards consummation and,
we assume, unhampered by want of authority therefor
on the part of the Federal government.  Relief was
sought by the *Attorney General* in two separate
actions, apparently because of a possible difference
between the question involved in the selection of lands
in lieu of unsurveyed school sections and portions
thereof within forest reservations, to which no pre-
emption or homestead right has attached, and the
question involved in the selection of lands in lieu of
school sections and portions thereof to which pre-
emption and homestead rights have attached rested
upon the initiation of such rights by settlement prior
to the survey of such sections.  We think, however,
that the same legal considerations are determinative
of both cases.

As already noticed, the *Attorney General* rests his
claim for the relief sought upon the theory that the
grant to the state was one *in praesenti* in the full sense
of the term, to unsurveyed as well as surveyed sec-
tions sixteen and thirty-six, and that, therefore, by
reason of the restrictions upon the manner of dispos-
ing of the granted lands, by the state, found in the

terms of the grant and the state constitution, the state cannot be lawfully divested of title to the lands in question in the manner contemplated. The school land grant here in question is found in the act of Congress of February 22, 1889, providing for admission into the Union of the states of North Dakota, South Dakota, Montana, and Washington, and in so far as we need here notice its language, reads as follows:

"Sec. 10. That upon the admission of each of said states into the Union, sections numbered sixteen and thirty-six in every township of said proposed states, and where such sections, or any parts thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said states for the support of the common schools, such indemnity lands to be selected within said states in such manner as the legislature may provide, with the approval of the Secretary of the Interior: *Provided,* That the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in Indian, military or other reservations of any character be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain.

"Sec. 11. That all lands herein granted for educational purposes shall be disposed of only at public sale, and at a price not less than ten dollars per acre, the proceeds to constitute a permanent school-fund, the interest of which only shall be expended in the support of said schools. But said lands may, under such regulations as the legislatures shall prescribe, be leased for periods of not more than five years, in quantities not exceeding one section to any one person or com-

pany; and such land shall not be subject to pre-emption, homestead entry, or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only." 25 U. S. Stat. at L., pp. 679, 680.

On February 28, 1891, there was passed an act of Congress amending §§ 2275 and 2276 of the revised statutes of the United States, which theretofore looked only to the preservation of the rights of preemption claimants who settle upon unsurveyed public lands, and to the selection by the states of other lands in lieu of such preempted lands, when the same are found upon survey to be within sections granted to the states for school purposes. Sections 2275 and 2276 of the revised statutes, as so amended, read as follows:

"Where settlements, with a view to pre-emption, or homestead have been, or shall hereafter be made, before the survey of the lands in the field, which are found to have been made on sections sixteen or thirty-six, those sections shall be subject to the claims of such settlers; and if such sections, or either of them, have been or shall be granted, reserved, or pledged for the use of schools or colleges in the state or territory in which they lie, other lands of equal acreage are hereby appropriated and granted, and may be selected by said state or territory, in lieu of such as may be thus taken by pre-emption or homestead settlers. And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said state or territory where sections sixteen or thirty-six are mineral lands, or are included within any Indian, military or other reservation, or are otherwise disposed of by the United States: *Provided,* Where any state is entitled to said sections sixteen and thirty-six, or where said sections are reserved to any territory, notwithstanding the same may be mineral land or embraced within a military, Indian or other reservation, the selection of such lands in lieu thereof by said state or territory shall be a waiver of its right to said sections. And other

lands of equal acreage are also hereby appropriated and granted, and may be selected by said state or territory to compensate deficiencies for school purposes, where sections sixteen or thirty-six are fractional in quantity, or where one or both are wanting by reason of the township being fractional, or from any natural cause whatever. And it shall be the duty of the Secretary of the Interior, without awaiting the extension of the public surveys, to ascertain and determine, by protraction or otherwise, the number of townships that will be included in such Indian, military or other reservations, and thereupon the state or territory shall be entitled to select indemnity lands to the extent of two sections for each of said townships, in lieu of sections sixteen and thirty-six therein; but such selections may not be made within the boundaries of said reservations: *Provided, however,* That nothing herein contained shall prevent any state or territory from awaiting the extinguishment of any such military, Indian or other reservation and the restoration of the lands therein embraced to the public domain and then taking the sections sixteen and thirty-six in place therein; but nothing in this proviso shall be construed as conferring any right not now existing.

"That the lands appropriated by the preceding section shall be selected from any unappropriated, surveyed public lands, not mineral in character, within the state or territory where such losses or deficiencies of school sections occur; . . ." 26 Stat. L., p. 796.

We note that these sections as amended give to our state larger lieu land rights than were accorded to it by the terms of the grant embodied in §§ 10 and 11 of our admission act, above quoted. It is really under this amendatory act of 1891 that the selection of lieu lands is sought to be made by our state land officers, the agreement with the Secretary of Agriculture above quoted evidently being merely a step in the bringing about of the narrowing of the limits of the national forest reservations within the state to the end that some of the lands embraced therein may become part

of the public domain, to the end that the state may select lieu lands therefrom.

Since the passage of the act of 1891, so amending §§ 2275 and 2276 of the revised statutes, the officials of the General Land Office, and the Department of the Interior of the Federal government having in charge the administration and disposition of its public lands, have at all times uniformly ruled and held that the states, including the state of Washington, having school land grants of sections sixteen and thirty-six, in the several townships therein, were not vested with the title to such sections embraced within the boundaries of reservations, including forest reservations, established prior to the survey of such sections; but that, as to such sections, the state's rights consisted of nothing more than the right to select from public lands, subject to disposition, lands in lieu thereof, or await the extinguishment of such reservations, and the survey of such sections within their boundaries. The officials of the General Land Office, and Department of the Interior of the Federal government have, also, since the passage of the act of 1891, uniformly ruled and held to the same effect with reference to the rights of preemption and homestead claimants making settlement upon unsurveyed sections sixteen and thirty-six. Among numerous decisions of these departments of the Federal government so ruling and holding, we note the following: *State of Washington v. Kuhn,* 24 Land Dec. 12; *State of South Dakota v. Riley,* 34 Land Dec. 657; *State of South Dakota v. Thomas,* 35 Land Dec. 171; *In re State of Montana,* 38 Land Dec. 247.

We recognize that these, and other decisions of the departments of the same import, rendered since the passage of the act of 1891, are merely persuasive, rather than conclusive, as against the contentions of the *Attorney General* that the school land grants to

the states of North Dakota, South Dakota, Montana and Washington were grants *in praesenti* as to unsurveyed lands, as well as surveyed lands. However, if the Supreme Court of the United States has held in harmony with the decisions of the General Land Office and the Interior Department upon that question, this court must regard itself as bound thereby, regardless of any former decision of our own to the contrary, since manifestly it is a Federal question.

In *California v. Deseret Water, Oil & Irr. Co.,* 243 U. S. 415, decided in March, 1917, there was involved the question of the state's title to a surveyed section sixteen within a forest reservation duly established in that state by Federal authority, to which section the state authorities had, because of its inclusion within the forest reservation, assumed to relinquish the claim of the state and select other public lands subject to disposition, in lieu thereof. The state supreme court had held, in substance, that the state's title to the land had completely vested in the state, and that its title thereto could not be divested by its officers surrendering the state's claim of title thereto and selecting other land in lieu thereof. 167 Cal. 147. It was apparently so decided by the California court as a Federal question, upon the ground that there was no Federal law authorizing the selection of lieu lands, upon the surrender of the state's claim to a surveyed school section, the title to which had, as it was held, vested completely in the state. Justice Day, speaking for the Federal Supreme Court, in reversing the California court and holding that §§ 2275 and 2276, revised statutes as amended by the act of 1891, did authorize such lieu land selection, and the surrender of the state's claim to the school section in question, said:

"The controversy reduces itself to the precise question whether when a forest reservation, subsequently

proclaimed, includes within its limits a school section surveyed before the establishment of the reservation, the state may under § 2275, Revised Statutes of the United States, as amended in 1891, waive its right to such section and select other lands in lieu thereof.

"The first part of the section, giving the right to select lands in lieu of such as were settled upon with a view to pre-emption or homestead, is clearly limited to settlements made before survey of lands in the field, and under the following provision, giving the right of selection to the state where the lands are mineral or are included in Indian, military or other reservation or are otherwise disposed of by the United States, it well may be that, in the absence of the proviso, the right of selection would be confined to instances where the lands were unsurveyed when found to be mineral or included in a reservation and this because if the lands were unreserved and not known to be mineral when surveyed the title would then vest in the state (*Sherman v. Buick*, 93 U. S. 209; *Heydenfeldt v. Daney Gold & Silver Mining Co.*, 93 U. S. 634; *United States v. Morrison*, 240 U. S. 192, 204, 207) and because lieu selections are usually, although not always, permitted where the right to the place lands is cut off before the time for the title to become vested. But the proviso, which was not originally in the statute, an important part of it, and according to a familiar rule, must be given some effect, it reads:

" 'Where any state is entitled to said sections sixteen and thirty-six, or where said sections are reserved to any Territory, notwithstanding the same may be mineral land or embraced within a military, Indian or other reservation, the selection of such lands in lieu thereof by the said State or Territory shall be a waiver of its rights to said sections.' This language, while not as clear as it might be, operates, as we interpret it, to give to the State a right to waive its right to such lands where, as in this case, the same are included in a forest reservation after survey, that is, after the title vests in the State. Unless this proviso refers to lands, the title to which has passed to the State it adds nothing to the statute and performs no office whatever. This

construction preserves the integrity of forest reservations, and permits the State to acquire other lands not surrounded by large tracts in such reservations which are withdrawn from settlement.

"It is true that the interpretation of the statute has not been uniform in the Department of the Interior, and it has been otherwise construed in at least one of the federal courts. *Hibberd v. Slack,* U. S. Circ. Ct. S. Dist. of California, 84 Fed. Rep. 571.. But the interpretation for which the state insists has been long given to it by the Interior Department. It was more than suggested in *Gregg v. Colorado,* 15 L. D. 151, 154, and *Rice v. California,* 24 L. D. 14, 15, was adopted upon full consideration in State of California, 28 L. D. 57, and has been uniformly followed ever since. *Territory of New Mexico,* 29 L. D. 364; School Land Opinion, 30 L. D. 438; *Dunn v. California,* 30 L. D. 608; *Territory of New Mexico,* 34 L. D. 599; State of California, 34 L. D. 613.

"In the brief presented by leave of court on behalf of the United States it is set forth that the rule laid down in State of California, 28 L. D., *supra,* is still adhered to by the Land Department; that selections aggregating many thousands of acres have been made in reliance upon it, and that no doubt large expenditures of money have been made in good faith upon the selected lands. It is therefore urged that such construction has become a rule of property. In this situation we should be slow to disturb a ruling of the department of the government to which is committed the administration of public lands. *McMichael v. Murphy,* 197 U. S. 304.

"Furthermore, the reasoning upon which the departmental interpretation is founded commends itself to our judgment as best calculated to carry out the purpose intended to be accomplished by the statute in question."

Whatever may be said as to the language of our school land grant being in terms *in praesenti,* it is, in any event, plain that the title to the surveyed granted school section in California did, upon its survey, vest

as completely in that state, though its grant was apparently not in terms *in praesenti,* as the title to an unsurveyed school land section vested in this state under its grant, prior to the survey of such sections.

Enough has already been said, we think, to render it plain that, in so far as the authority of Congress and the legislature of this state are necessary to be given therefor, the former by the act of 1891 amending sections 2275 and 2276 of the revised statutes, and the latter by the act of 1913, above quoted, the lieu land selections contemplated by the land officers of this state and by these actions sought to be prohibited, are fully authorized. Manifestly Congress could modify the conditions of the original grant in so far as it contained restrictions upon the disposal of the granted lands by the state. This, in substance, is what Congress did by the act of 1891. In other words, Congress has said by that act, in substance, that the state may so relinquish whatever claims it may have to lands of the nature here in question, unhampered by any restrictions against the disposal of granted school lands which may be found in the terms of the original grant, embodied in our admission act of 1889. And, the legislature of this state, in so far as it had the power to do so, by the act of 1913 above quoted, has plainly authorized the state's land officers to select public lands subject to disposition, in lieu of lands here in question, and relinquish to the Federal government the state's claim to the latter.

We now inquire, was it within the constitutional power of the legislature to authorize the state's administrative officers to relinquish its claim to the lands in question, and select other public lands subject to disposition, in lieu thereof. It is contended by the *Attorney General* that the legislature does not possess such power, because of the restrictions upon the man-

ner of disposition of granted school lands found in Article XVI, of our state constitution, and particularly the following portions thereof:

"Section 1. All the public lands granted to the state are held in trust for all the people, and none of such lands, nor any estate or interest therein, shall ever be disposed of unless the full market value of the estate or interests disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state; nor shall any lands which the state holds by grant from the United States (in any case in which the manner of disposal and minimum price are so prescribed) be disposed of except in the manner and for at least the price prescribed in the grant thereof, without the consent of the United States.

"Sec. 2. None of the lands granted to the state for educational purposes shall be sold otherwise than at public auction to the highest bidder; and the value thereof, less the improvements, shall, before any sale, be appraised by a board of appraisers, to be provided by law, the terms of payment also to be prescribed by law, and no sale shall be valid unless the sum bid be equal to the appraised value of said land. . . ."

It may be conceded for argument's sake that, if title to the particular lands in question has become vested in the state, to dispose of such lands as contemplated, and here sought to be prohibited, would be in violation of these constitutional restrictions. However, if title to the particular lands in question did not vest in the state upon its admission to the Union, and has not since then vested in the state, because of preemption and homestead claims initiated by settlement prior to government survey, because of the creation of national forest reservations, or because of want of government survey thereof, we think it plain that a relinquishment of the state's claim thereto and the exercise of its rights to select other lands in lieu thereof to which it will immediately acquire a completely vested title, will

not be a disposition of the granted school lands of the state in violation of these constitutional provisions.

Our problem then, is manifestly reduced to this: Was our school land grant a grant *in praesenti* in the sense that title to all sections sixteen and thirty-six within the state, those which were necessary to be eventually identified by a government survey, as well as those which were then so identified, vested immediately in the state upon its admission to the Union. That this is a Federal question, it seems to us to be too plain to admit of serious argument to the contrary. We must approach it, therefore, from that viewpoint. It must be conceded that a somewhat persuasive argument can be made rested upon the language of our school land grant, found in sections 10 and 11 of our admission act above quoted; and we are not unmindful of the fact that this court reached the conclusion that the grant was *in praesenti* in the full sense claimed by the *Attorney General,* in its decision in *State v. Whitney,* 66 Wash. 473, 120 Pac. 116, decided in 1912, wherein that view of the law was ably presented by Judge Morris, speaking for the court. However, since then the Supreme Court of the United States has rendered at least one decision wherein a former decision of that court was interpreted rendering it plain, we think, that the decision of this court in the *Whitney* case upon that Federal question was erroneous.

In *United States v. Morrison,* 240 U. S. 192, there was involved the claim of Morrison to title in a section sixteen, in the state of Oregon, under a deed therefor given him by the state, the state assuming to be the owner of that section and entitled to convey it by virtue of the school land grant made to it by the Federal government in the act for the admission of the state into the Union. We note that the language of that grant was, "shall be granted to said state for the

use of schools," which language does not, it must be conceded, seem to afford as substantial grounds for arguing that the grant was *in praesenti* in the sense of making a present grant of unsurveyed sections, as does the language of our grant above quoted. The state's conveyance of the section to Morrison occurred before its survey by the government, hence the conveyed section was not legally identified upon the ground. Prior to the conveyance by the state to Morrison, a national forest reservation was duly created embracing the section within the limits of such reservation. The Federal supreme court, upon appeal from the ninth circuit court of appeals, which court had heard the case upon appeal from the Federal district court for Oregon, held that title to the section in question did not vest in the state upon its admission to the Union, and never had vested in the state prior to the section being embraced within the limits of the national forest reservation, because of want of legal identification by government survey, and that the government's title was unimpaired by the Oregon school grant and the state's conveyance of the section to Morrison. We notice this decision of the Federal Supreme Court, not for the purpose of showing the mere holding of the court that the Oregon grant was not one *in praesenti,* since that case might be differentiated from the one before us in view of the difference between the language of the Oregon grant and our grant, but for the purpose of showing the views of the court and its interpretation of a previous decision rendered by it, which to us seems conclusive against the contention of the *Attorney General* that our grant was one *in praesenti* in the sense claimed by him. Justice Hughes, in the course of an exhaustive review of the school land grants to the several States made the following

observations, which we think are particularly enlightening in our present inquiry:

"In the case of *Heydenfeldt v. Daney Gold &c Co.*, 93 U. S. 634, there had been a disposition of the land under the authority of Congress between the date of the school grant and the date of the survey. This case arose under the school grant to Nevada (Act of March 21, 1864, c. 36, 13 Stat. 30, 32) which was one of the exceptional instances where words of present grant were used, these however being qualified by the clause relating to sale or other disposition. The act provided: 'That sections numbers sixteen and thirty-six, in every township, and where such sections have been sold or otherwise disposed of by any act of Congress, other lands equivalent thereto . . . shall be; and are hereby, granted to said state for the support of common schools.' The plaintiff claimed under a patent issued by the State of Nevada in 1868. The land was mineral land, and the defendant was in possession, carrying on the mining business, having obtained a patent from the United States under the acts of July 26, 1866 (c. 262, 14 Stat. 251) as amended, and May 10, 1872 (c. 152, 17 Stat. 91). The entry and claim of the defendant's predecessors in interest were made in 1867 prior to the survey of the section in question. It was held that the lands were subject to disposition of Congress until the survey and its approval; and hence the judgment in favor of the defendant was affirmed. The words of present grant were deemed to be restricted by the words of qualification. The court said that it was intended to place Nevada 'on an equal footing with states then recently admitted. Her people were not interested in getting the identical sections 16 and 36 in every township. Indeed, it could not be known until after a survey where they would fall—and a grant of quantity put her in as good a condition as the other states which had received the benefit of this bounty. A grant operating at once, and attaching prior to the surveys by the United States, would deprive Congress of the power of disposing of any part of the lands in Nevada, until they were segregated from those granted. In the meantime, further

improvements would be arrested, and the persons, who prior to the surveys had occupied and improved the country, would lose their possessions and labor, in case it turned out that they had settled upon the specified sections. . . . Until the *status* of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them; and if in exercising it the whole or any part of the 16th or 36th section had been disposed of, the state was to be compensated by other lands equal in quantity, and as near as may be in quality. By this means the state was fully indemnified, the settlers ran no risk of losing the labor of years, and Congress was left free to legislate touching the national domain in any way it saw fit, to promote the public interests.'

"It is said that the Nevada school grant added the words 'by any act of congress' to the phrase 'otherwise disposed of,' and that the former words are not in the Oregon grant. But this does not mark a distinction, as 'otherwise disposed of,' of course, implies that the disposition shall be by competent authority. It is also urged that the court emphasized the fact that there had been no sale or disposition of the public lands in Nevada prior to the Enabling Act and therefore that the clause could refer only to future disposition; whereas, in the case of Oregon, there had been earlier provisions for the disposal of the public domain. But congress used the same phrase substantially in nearly every one of the school grants, and it was the manifest intention to place the states on the same footing in this matter. The same clause, relating to the same subject, and enacted in pursuance of the same policy, did not have one meaning in one grant, and a different meaning in another; it covered other dispositions, whether prior or subsequent, if made before the land had been appropriately identified by survey and title had passed. Nor is a distinction to be observed between mineral lands and other lands, if in fact Congress disposed of them. The validity of the disposition would not be affected by the character of the lands, although it might supply the motive for the action of Congress.

We regard the decision in the *Heydenfeldt* case as establishing a definite rule of construction. . . .

"The rule which the *Heydenfeldt* case has established has, we understand, been uniformly followed in the land office. After reviewing the cases, Secretary Lamar concluded (December 6, 1887; to *Stockslager, Commissioner,* 6 L. D. 412, 417) that the school grant 'does not take effect until after survey, and if at that date the specific sections are in a condition to pass by the grant, the absolute fee to said sections immediately vests in the state, and if at the date said sections have been sold or disposed of, the state takes indemnity therefor.' And see, to the same effect, *Niven v. California,* 6 L. D. 439; *Washington v. Kuhn,* 24 L. D. 12, 13; *California v. Wright,* Id. 54, 57; *South Dakota v. Riley,* 34 L. D. 657, 660; *South Dakota v. Thomas,* 35 L. D. 171, 173; *F. A. Hyde,* 37 L. D. 164, 166; to Atty. Gen. of Montana, 38 L. D. 247, 250."

It is to be particularly noticed that the decision of the Secretary of the Interior in the case of *State of Washington v. Kuhn,* 24 Land Dec. 12, is cited with apparent approval in the conclusion of the above quoted portion of the *Morrison* decision. That decision rendered by the Secretary of the Interior was, in substance, a holding that the school land grant to this state, found in the admission act of 1899, was not one of present grant at the time of the admission of the state into the Union, that it did not vest title to sections sixteen and thirty-six in the state prior to survey thereof, and that in the meantime the land which might ultimately be found by the government survey to fall within such sections was subjected to disposition by the Federal government, leaving to the state only its lieu land selection right.

In the light of the decision of the Federal Supreme Court in the *Heydenfeldt* case, as interpreted in the *Morrison* case above quoted from, we cannot escape the conclusion that the decision of this court in *State v.*

*Whitney,* holding that our school land grant was one *in praesenti,* of unsurveyed as well as surveyed sections, completely vesting title in all of said sections at the time of the grant, must now be regarded as erroneous, and no longer controlling upon that Federal question.

The judgments appealed from are affirmed.

ALL CONCUR.