[Civ. No. 3806.   Third Appellate District.—June 18, 1929.]

CHURCHILL COMPANY (a Corporation), Respondent, v. ELLEN BEAL, as Special Administratrix, etc., et al., Appellants.

Charles L. Gilmore for Appellants.

Tapscott & Tapscott for Respondent.

PLUMMER, J.—Plaintiff had judgment in an action brought to quiet title to certain lands described in its complaint. From this judgment the defendants appeal. While the action is, in form, one to quiet title, the only issue really involved is the location of the west boundary line of township number 47 north, range number 2 east, Mount Diablo base and meridian, in so far as it affects sections 18 and 19. If the boundary line claimed by the plaintiff, and adopted by the trial court as the true west boundary line of the lands belonging to the plaintiff, is the true boundary line, then the judgment of the trial court should be affirmed. If, on the other hand, as contended by the defendants, the boundary line as run by a surveyor named George W. Wakefield, in 1906, is the true westerly boundary line of said sections, then and in that case the judgment should be reversed. The distance between the two lines just referred to includes a strip along said sections a trifle over 5 chains in width.

The record shows that in 1858 one Tracy surveyed the west boundary line of township 47, the field-notes of which were put in evidence. The Tracy survey was on the town-

ship line only; he did not survey section or subdivision lines of the land. In October, 1873, while the land was still a part of the public domain of the United States, Alex McKay resurveyed certain township lines, and in the field-notes of his survey refers to a number of natural objects along the line of the survey, such as the road from Yreka to Oregon, Cottonwood Creek and the rock fence; also a point where the line enters certain low swamp or wet land. McKay's survey included a survey of the sections and subdivision of the lands involved in this suit, including the meander lines through sections 18 and 19. The field-notes of this survey were introduced in evidence. The McKay survey was approved February 3, 1880, and in this manner became the official survey of the land. A plat of this survey was filed in the Shasta Land Office on April 1, 1884. The lands in dispute were shown as surveyed lands on the plat just referred to. Following this survey the lands belonging to the plaintiff were conveyed by the United States either to the plaintiff or to the plaintiff's grantors, by patents dated May 6, 1887, December 3, 1889, and August 20, 1902. The plaintiff's title to whatever lands were and are included in these patents is not disputed. The only question is as to where these lands are located, starting for a description thereof from the true boundary line to the west. In 1906, in order to locate some unsurveyed lands lying to the east of the lands belonging to the plaintiff, a resurvey was made of township 47 north, range 2 east, M. D. B. & M., by a surveyor named George W. Wakefield. This survey was approved in 1909, and the plat thereof filed in the surveyor-general's office in San Francisco. The Wakefield survey does not follow what the court found to be the true line of the McKay survey, and, so far as the record shows, the field-notes thereof do not make mention of any corners or of natural or artificial objects mentioned and referred to in the McKay survey. As we read the record we do not find that the Wakefield survey makes any mention of any monument or stake at the southwest corner of section 19, as located by McKay. The trial court found that the southwest corner of section 19, as located by McKay, and which constitutes the starting point for determining the lands belonging to the plaintiff and the lands granted by the United States to the plaintiff and the plaintiff's grantors,

was at a point a trifle over 5 chains east from the line in-
dicated and the point indicated by the Wakefield survey.
That the trial court was correct in the location of the south-
west corner of section 19 is supported by the field-notes of
the McKay survey. The first object referred to in the field-
notes as the west line of section 19 is extended north, is
the road running from Yreka to Oregon. This road runs
in a diagonal direction from the southeast to the northwest,
and is mentioned in the field-notes of the McKay survey as
being distant from the southeast corner 3.50 chains. On
the Wakefield survey the line crosses this road at a distance
from the southwest corner of section 19, of 6.80 chains.
The next object referred to in the McKay survey is Cotton-
wood Creek, which, on the McKay survey, is 12 chains north
of the southwest corner of section 19. On the Wakefield
survey it is north 13.30 chains; thence following the line
northerly on the McKay survey, we find a rock fence distant
form the southwest corner of section 19, 62.05 chains. This
rock fence runs in a northwesterly and southeasterly direc-
tion, and is intercepted by the Wakefield line at a distance
of 71.79 chains from the southwest corner of section 19, as
shown by the Wakefield survey. Likewise, another object
known as the ''Emigrant Road,'' referred to in the Mc-
Kay survey, crosses the westerly line of section 19 at a
distance of 76.90 chains from the southwest corner of sec-
tion 19.

Irrespective of oral testimony of some witnesses that they
were familiar with the location of the southwest corner of
section 19, as designated in the McKay survey, these ob-
jects and the calls and distances were and are sufficient to
support the conclusion of the trial court as to the true loca-
tion of the southwest corner of section 19. In other words,
the field-notes and the objects referred to in the McKay
survey cannot be superimposed upon the line run as the
westerly line of sections 18 and 19 by Wakefield, which again
supports the finding of the trial court as to the location of
the southwest corner of section 19, as established by Mc-
Kay, and the true westerly line of the sections involved in
this action.

The record contains the testimony of two civil engineers
or surveyors, one named Harvey J. Sarter, who, for a num-
ber of years was the county surveyor of Shasta County, and

also the testimony of a surveyor named Zumwalt. These witnesses testified to retracing the lines run by McKay, Sarter testifying that he found something to mark every section corner and quarter-section corner of the survey run by McKay, and that he found the southwest corner of section 19 of the survey run by McKay. These resurveys or retracings of the lines extended back over a period of twenty years; that he was not making a new survey, but a location of the McKay corners on the ground, and that he followed, strictly, the McKay field-notes; that he found the objects referred to in the McKay field-notes at the distances therein stated from the southwest corner of section 19. A witness by the name of Churchill testified that he had known the southwest corner of section 19 since 1890. The surveyor Zumwalt testified to finding the objects referred to in the McKay field-notes, at substantially the same distance from the southwest corner of section 19, as stated in the field-notes. The witness Sarter also testified that he was familiar with the location on the ground of the corners marking the west line of sections 18 and 19, according to the Wakefield survey, and that their position, with reference to the McKay corners, was a considerable distance west from the same corners set by McKay.

The summary shows that there are two surveys involved in this action, one by McKay in 1873 and the other by Wakefield in 1906. The plaintiff claims title and location of land having its westerly boundary line according to the McKay survey. The appellants in this action contend that the Wakefield resurvey made in 1906, and approved in 1909, supersedes the earlier survey, and that the appellants' west line must be held coterminus with the Wakefield survey. In support of their contention that the rights of the parties to this action must be determined according to the Wakefield survey, a number of cases are cited to the effect that the United States land department has a right to make resurveys of the public domain and of the lands belonging to the general government, and that the resurveys or latest approved surveys must be held controlling. With this contention we agree, so long as the resurveys have to do only with the lands belonging to the general government. So long as the lands are unpatented or unconveyed, or have not passed into private ownership, the right to make resur-

veys, as contended for by the appellants, undoubtedly exists. In this case, however, that question is not really involved. The question really is, Has the government a right to make a resurvey so as to change the lines of an original survey concerning lands to which it no longer holds title? In other words, can a resurvey of lands which have already been granted, made for the purpose of running lines on adjacent public land, be so made as to change the location on the ground of lands to which the government has no ownership. As a prelude to an answer to this question we may state that the record shows that the patents issued to the plaintiff and the plaintiff's grantors were based upon the original plat and field-notes of the survey made by McKay in 1873. Every one of the patents refer to such plat and field-notes. In 22 Ruling Case Law, page 283, the law in relation to patents referring to and based upon plats and field-notes is thus stated: "It is a well-settled principle that when lands are granted according to an official plat of the survey of such lands, the plat itself, with all its notes, lines, descriptions and landmarks become as much a part of the grant or deed by which they are conveyed, and controls, so far as limits are concerned, as if such descriptive features were written out on the face of the deed or the grant itself. The survey, in other words, is to be taken as a part of the patents, and these must be construed together." The same rule is supported by a number of authorities, and is stated in 9 C. J. 180 as follows: "When maps, plats or field notes are referred to in a grant or conveyance, they are to be regarded as incorporated into the instrument, and are usually held to furnish the true description of the boundaries of the land." And in the same volume of C. J., on page 164, it is said: "Original corners, as established by the government surveyors, if they can be found, or places where they were originally established, if they can be definitely determined, are conclusive on all persons owning or holding with reference thereto, without regard to whether they were located correctly or not, and must remain the corners or monuments by which to determine the boundaries."

In 4 Cal. Jur., page 412, upon the subject of establishing corners, the rule, supported by authorities, is thus stated: "In a controversy involving a boundary the description of

which commences and ends at a corner marked by a monument which had long since disappeared, it is the duty of the court to ascertain, if possible, the true position of the corner; accurately, if it can be done, or approximately within reasonable limits if the exact position cannot be ascertained with absolute certainty. If possible the court should fix the place of the monument where it will best accord with natural objects described in the field notes as being about it, and found to exist on the ground, and which is least inconsistent with the distances mentioned in the notes and plat of the survey.'' And in relation to the data to be considered by the court in fixing the place of a lost corner, it is further said: ''In establishing a disputed corner, those objects intended to mark the corner, and referred to in the notes of the original survey as being nearest the corner, are, when satisfactorily established, stronger evidence than objects more remote.'' ■ Thus, in the case at bar, the objects referred to in the McKay field-notes, being nearest to the disputed corner, were proper facts to be considered by the trial court in determining the location of the disputed corner at a place which would cause it to correspond precisely with the calls and distances of the McKay survey. Again, before citing the cases bearing upon the real question presented for determination as stated above, it may be said that this action is not a collateral attack upon any government survey. No attempt is made to invalidate the Wakefield survey of 1906. It is only an attempt to fix the line of the original McKay survey as made and located on the ground in 1873, so that none of the cases bearing upon collateral attack on surveys need be considered. The question of what objects and data may be considered by the trial court in determining the location of a boundary line or of a disputed corner has been passed upon so frequently that we deem it unnecessary to review the decisions bearing thereon further than to say that the objects mentioned and referred to in the McKay survey are shown by the authorities to constitute proper data for the trial court to consider in fixing the location of the southwest corner of section 19 as located in the McKay survey, and also the west boundary line of the lands involved in this action.

■ We come now to the question urged by the appellants, that the resurvey by Wakefield, being a government

survey, is controlling. The law, however, is well settled that when lands are sold by the general government with regard to a survey that has already been made, no resurvey can be made so as to affect, limit or change the boundaries of the lands which have theretofore been conveyed. In the case of *Washington Rock Co.* v. *Young*, 29 Utah, 108 [80 Pac. 382, 110 Am. St. Rep. 666], we find the following: "On a resurvey of a tract of land to establish lost boundaries, the original corners as established by the government surveyors, if they can be found, or the places where they were originally established, if they can be definitely determined, are conclusive without regard to whether they are located correctly." This case, as reported in 110 Am. St. Rep., *supra*, contains an extended note beginning on page 667. A long list of authorities are there collected supporting this statement: "When public land has been surveyed by authority of the United States, and patented with reference to the boundaries as fixed by such surveyors, the corners and lines so established, whether correct or not, are conclusive, and cannot be altered or controlled by other surveys." In other words, as elsewhere stated in the note: "The true corner of a patented governmental subdivision of land is where the United States surveys in fact establish it, whether such location is right or wrong as shown by a subsequent survey."

. In the case of *Cragin* v. *Powell*, 128 U. S. 700 [32 L. Ed. 566, 9 Sup. Ct. Rep. 566], where the subject of prior and subsequent surveys was considered, the court thus holds the law to be: "That the power to make and correct surveys of the public lands belongs to the political department of the government, and that while the lands are subject to the supervision of the general land office, the decisions of that bureau in all such cases, like that of other special tribunals upon matters within their exclusive jurisdiction, are unassailable by the courts except by a direct proceeding, and that the latter have no concurrent or original powers to make similar corrections, if not an elemental principle of our land law, is settled by such a mass of decisions of this court that its mere statement is sufficient." (Here follows citation of numerous authorities.) The court then continues: "It is conceded that this power of supervision or correction by the commissioner of the general land office is subject to

necessary and decided limitations. Nor is it denied that when the land department has once made and approved a Governmental survey of public lands, the plats, maps, field notes and certificates all having been filed in the proper office, and has sold or disposed of such lands, the courts have power to protect the private rights of a party who has purchased in good faith from the government, against the interference or appropriations of corrective surveys made by that department subsequently to such disposition.''

That is the limitation involved in this action. The resurvey was made subsequent to the time when the government had parted with its title, and its power to recapture any of the lands theretofore sold to the plaintiff by means of a resurvey, or otherwise, was wanting. If the original survey, as made by McKay, fixed the westerly boundary of the lands granted to the plaintiff and the plaintiff's grantors as found by the trial court, then, and in that case, whether the line as originally located was correct becomes immaterial. It is the correct line in the determination of this action, as it fixes on the grounds the lands covered by the patents, the ownership of which has passed to the plaintiff in this action. The following California cases support the rules which we have just herein set forth: *Kimball* v. *McKee*, 149 Cal. 435 [86 Pac. 1089]; *Foss* v. *Johnstone*, 158 Cal. 119 [110 Pac. 294]; *Weaver* v. *Howatt*, 161 Cal. 77 [118 Pac. 519]; *Weaver* v. *Howatt*, 171 Cal. 302 [152 Pac. 925]; *Spiers* v. *Spiers*, 176 Cal. 557 [169 Pac. 73]; *Wilmon* v. *Aros*, 191 Cal. 80 [214 Pac. 962]. Practically all of the cases herein referred to support the principle that in making a resurvey to determine the boundaries of lands which have been granted, the tracks of the original survey should be followed, so far as it is possible to discover the same, and locate upon the grounds the lines of the lands patented as nearly as may be according to the original survey thereof and in reference to which lands have been sold.

It is further contended by the appellants that the judgment of the court is uncertain, and that the cause should be reversed and sent back to the trial court, to the intent and purpose that the easterly meander line of the plaintiff's lands may be more definitely fixed. The easterly meander line just referred to would constitute the dividing line between lands belonging to the plaintiff and lands be-

longing to the defendants. We think, however, in view of the findings and judgment of the trial court, which follow the field-notes of the McKay survey, and in view of the definite location of the starting point, to wit, the southwest corner of section 19, the objection of appellants in this particular is untenable and need not be considered further.

Objection is also made by the appellants that they suffered prejudice by reason of the failure of the trial court to pass upon their motion to strike out certain testimony given by the witness Sarter. While we think it is advisable in all cases for a court to pass upon motions in relation to striking out of testimony, when made, in this particular case there does not appear any reasonable objection to the course pursued by the trial court, in that appellants were not deprived of any opportunity to make any defense which they had. Their cross-examination of Sarter was very lengthy and went into all the details of the respective surveys involved. No continuation of the trial of the case was asked in order that they might meet any of the testimony given by Sarter. The testimony given by Sarter was clearly admissible. It related to retracing the lines as originally established by McKay. What the witness testified to did not constitute a resurvey of the plaintiff's land or the reestablishment of any of the lines. It was simply a proceeding to ascertain where the lines and corners had been originally established by McKay. The record does not contain any showing that the appellants were taken by surprise by reason of any testimony given by the witness Sarter. Under these circumstances the appellants cannot well claim that they suffered prejudice by reason of the failure of the court to promptly deny their motion to strike out the testimony of the witness Sarter.

The judgment of the trial court is affirmed.

Thompson (R. L.), J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 18, 1929, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 15, 1929.

All the Justices present concurred.