**UNITED STATES v. AIKINS et al.**
Civil Action No. 617–ND.

United States District Court
S. D. California, N. D.
May 20, 1949.

James M. Carter, United States Attorney, Los Angeles, Cal., Francis B. Critchlow, Special Assistant to the Attorney General, Department of Justice, Lands Division, for plaintiff United States of America.

Herbert W. Clark, San Francisco, Cal., for defendants Honolulu Oil Corporation and Seaboard Oil Co. of Delaware.

Bronte M. Aikins, San Francisco, Cal., for defendants A. L. Aikins and B. M. Aikins.

Philip M. Wagy, Bakersfield, Cal., for defendants George Hay Corporation, Ltd., George B. Parker, Nelle Grenville Parker, Vernon S. Batz, Edna Batz, and D. M. Jordan.

Patricia Lane, San Francisco, Cal., for defendant Florence K. Livingston, as executrix of last will of Florence L. Kirchen, deceased.

A. W. Mitchem and Arch H. Vernon, Los Angeles, Cal., for other defendants.

HALL, District Judge.

An original government survey by one Reed in 1869 of Township 29 South, Range 20 East, M. D. B. & M., showed Section 36 therein to contain 640 acres of land. In 1892 a re-survey of the entire township was ordered by the Government and made by one Carpenter, which re-survey was approved in 1894. In the meanwhile, the State of California had sold and issued patents, as school land, to all of the land which had been included in Section 36 of the Reed survey. By the Carpenter re-survey the southerly and easterly boundaries of the township were shifted south and east, and all the boundaries of the land designated as Section 36 in the Reed survey were shifted southward and eastward. The result of such shift was to show Section 36 on the Carpenter survey to include only a portion of the lands previously included in Reed's Section 36, and also to include in Carpenter's Section 36 additional lands not theretofore designated on any sur-

vey as being in any Section 36, or even being within the township above mentioned.[1] The latter land was conveyed to Judson H. Jordan by the State of California as school land on December 1, 1914, pursuant to a mandate of the California Courts, issued as a result of Jordan v. Kingsbury, 1912, 25 Cal.App. 166, 143 P. 69. It is the land so transferred to Jordan to which the Government now seeks to quiet title as against the defendants who are the successors in interest of Jordan, who was the successor in interest of the State of California.

Not much can be added to what was said in Jordan v. Kingsbury, 25 Cal.App. 166, 143 P. 69, as to the passage of title from the United States to the State of California to the land involved here, which case concerned the identical property, identical surveys and identical chain of title as is involved in this case.

The fact that the United States was not a party to that suit does not alter the reason and logic supporting the conclusions of the court therein. This is particularly so in view of the fact that the court in that case, of necessity, had to construe the very statutes and surveys involved here, and moreover based its conclusions on the United States Supreme Court cases there cited, Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566; Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428; Gleason v. White, 199 U.S. 54, 25 S.Ct. 782, 50 L.Ed. 87, and particularly Knight v. United Land Association, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974, involving a re-survey, which the court held to be binding on the courts if the Department of the Interior then had jurisdiction and power to order and to make the re-survey.

Neither of the parties here are questioning the right or power of the Government to have made the Carpenter re-survey in 1893.

While the special defense raised in defendant's answer may be construed to be a plea in estoppel, the parties have not argued that point in the copious and excellent briefs filed.

Rather, the defendants have chosen to stand on the position that the Granting Act of 1853, 10 Stat. 244, construed in connection with the Survey Acts, 43 U.S.C.A. § 751 et seq., and the Lieu Lands Act, 43 U.S.C. 851, 852, clearly granted to the State of California at least two Sections of land of 640 acres each in each township, and also granted more than that amount if the surveys as actually made by the Government showed the total acreage of either Sections 16 or 36 to exceed 640 acres, and that this is so whether such excess acreage is shown on an "original" survey, or by a "corrective" survey, or on a "re-survey."

The Government's position may be stated thusly: it concedes that under the Granting Act, the Survey Acts, and the Lieu Land Acts (supra) the State is entitled to 640 acres in, or in lieu of, each Section 16 and 36 in each township; it further concedes that if either or both Sections 16 and 36 contain more than 640 acres as shown by an *original* survey, such excess acreage vests in the State; but contends that if such original survey shows a total of 640 acres in either section (Section 36 in this instance), the grant to the State is exhausted as to that section, even though on a re-survey such Section 36 is relocated so as to exclude a portion of the original Section 36 and include in the designated Section 36 of the re-survey, land not included in the original survey of Section 36. The government's contention boils down to this; that the State can and does under the Granting, Survey and Lieu Lands Acts, get any excess of 640 acres shown in a school section by an *original* survey, but that said Acts do not operate to grant such excess in event of a *re-survey*.

The land covered by the 1869 Reed Survey having passed to the State of Cali-

---

[1] Carpenter's survey of Section 36 included about 330 acres of land which had been included by Reed in his previous survey of Section 36. The remainder of Reed's Section 36 was shown by Carpenter to be in what Carpenter designated as lying in Sections 25, 26 and 35. The total acreage shown by Carpenter to lie within the exterior boundaries of his Section 36 was 634.-63 acres.

A subsequent "segregation" survey by Wilkes in 1915 confirmed the boundaries of Section 36 as shown by Carpenter.

fornia upon the approval of such survey, United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599, and cases there cited, and having been sold and disposed of by the State prior to the Carpenter re-survey, as approved in 1894, could not be affected by such re-survey, as private rights had in the meanwhile intervened. The Reed Survey, even though declared "fraudulent" and "worthless" as a basis for disposal of the lands in the township, was sufficient to pass title to those depending on it. Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566; United States v. State Investment Company, 264 U.S. 206, 44 S.Ct. 289, 68 L.Ed. 639, and cases there cited.

It should be noted at this point that no charge or suggestion of fraud or misdealing is involved in this case, and that the record shows complete arms-length dealing between the Government and all parties concerned. It should also be noted that there is no charge or suggestion that the lands in question were known to be mineral in character, or of a class otherwise unavailable to the State at the time of the claimed passage of title to the State of California, in 1894.

The Granting Act of 1853, 10 Stat. 244, 246, § 6, did *not* put the terms of the grant in acres of land. It did *not* grant a maximum of 1280 acres of land in each township. It did *not* grant 640 acres *in* each Section 16 and *in* each Section 36. It *did* grant to the State of California for public school purposes *Sections* 16 and 36 in each township, *without any mention of the number of acres.* This is true also as to the Acts examined which granted lands to other states. None of them mentioned acreage; each of them grants *Sections.*

(In some instances other numbered Sections are granted).

■ The Granting Act was passed before the public lands were surveyed. The grant therein contained did not become effective until the lands were identified by actual survey. United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599. What was to be Sections 16 and 36 had thereafter to be determined. This was done by that department of the Government charged with the duty of making surveys and the administration of the public land laws. The Government at all times had control of the making and returning of the surveys. Thus, what constituted Sections 16 and 36 in *numbers of acres* and *where they were to be located* on the surface of the ground, were to be determined by the Government under the previously enacted Survey Statutes. These Statutes have been on the books many years and are now found in Sec. 751 et seq., of Title 43 U.S.C.A. They are derived from the Acts of May 18, 1796, 1 Stat. 464, and the Act of May 10th, 1800, 2 Stat. 73. The first paragraph of Section 751 provides for townships of six miles square; the third paragraph provides that "The township shall be subdivided into sections, containing, as nearly as may be, six hundred and forty acres each * * *"; the fifth paragraph provides that where a township may be more or less than six miles square, "the excess or deficiency shall be specially noted, and added to or deducted from the western and northern ranges of sections or half-sections in such township, according as the error may be in running the lines from east to west, or from north to south." [2]

---

[2] Upon examination of the Act of May 10th, 1800, supra, it is noted that the accommodation for excesses or deficiencies to be placed on the western or northern ranges of Sections in each township was according as the error may be in running the lines from east to west or "from south to north." If the lines were so run on the ground the natural tendency of error in surveys would result in the excesses or deficiencies in Sections being on the north and west tiers of Sections in each township. But the Statute as it now stands and as it stood on the date of the surveys in question provided for the accommodation of errors as the lines were run "from north to south." If the lines were run on the ground *from* north to *south*, the natural tendency of error would be to place the excess or deficiency on the southern tier of sections instead of the northern tier. An examination of the Statutes failed to disclose just when this change in wording was made.

The Act of May 18, 1796, 1 Stat. 465, provided that fractional Sections in a township should be "annexed to, and sold with, the adjacent entire sections."

■ In any event, the requirements of the fifth paragraph of Section 751, have not been generally followed. It is a matter of common knowledge, that many townships in California have excesses on the easterly and southerly tiers of sections. Attached to the defendants' brief is a list of Sections 16 and 36, totaling 145 Sections, in the State of California which have been surveyed and granted to the State as school lands, each of which exceeds 640 acres; 32 were Sections 16, located in the middle tier of Sections. One Section 36 contained 1716.70 acres, not only on the original survey approved in 1866, but on the re-survey for subdivisional purposes approved in 1875 (Ex. A–1 and A–2 to plaintiff's brief.) Six of the Sections contained over 1,000 acres. And it is admitted by the plaintiff that the statute has not been followed.

■ But the plaintiff contends that such Sections were all granted to the State of California, and their size not challenged by the Government, because they were indicated to be that size on the original surveys, and not on a re-survey. The effect of this contention is that the Granting Act applied only to original surveys and not to re-surveys. I cannot read the Granting Act, the Survey Acts and the Lieu Land Acts to mean that when the Government designates land as being within Section 36 on a re-survey, such land should not pass to the State any more than I can read such a construction of those Acts as to an original survey. There is certainly nothing in the language of any statute called to my attention, or which on independent research I have been able to find, which says so, or which would warrant such a construction. If under the Granting Act, the Survey Acts, and the Lieu Land Acts the State of California was to be limited to 640 acres in, or in lieu of, each Section 16 and 36 and no more, then the Government had no right at any time to grant more than 640 acres in any Section of any township, whether on original survey or re-survey, and the excesses in each of the 145 Sections above mentioned would be void.

No matter how the plaintiff's contentions are approached or viewed, they come down to this; that the Survey Acts of 1796 and 1800, 43 U.S.C.A. § 751 et seq., limited the total acreage of all Sections 16 and 36 to 640 acres, by virtue of the provisions therein that all Sections should contain 640 acres "as nearly as may be," and that excesses or deficiencies should be added to or deducted from the Northern and Western ranges or tiers of Sections in each township. If that position is correct, I cannot see how any school section originally surveyed as containing more than 640 acres in California, or the other public land states can rest on a secure title. If that contention is correct, then the excesses of 640 acres of land in each original survey of school Sections are equally as void as under re-surveys of those Sections. And this would be so of all the vast areas in the public land states, as the Survey Statutes have been in force since the formation of the country.

■■ Without question the Government at all times involved here, had the power to make surveys, to correct surveys and to make re-surveys. Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566; Knight v. United Land Association, 142 U.S. 161, 176, 12 S.Ct. 258, 35 L.Ed. 974. The Government therefor had the power to make and approve the Reed survey in 1869. By the same token it had the power to declare that the Reed survey was "fictitious" "fraudulent," "grossly erroneous and worthless as a basis for the disposal of the lands,"[3] in said township and to conclude and order that "the only proper remedy is a complete re-survey of the township", and to order that all "lines and corners" made by Reed be "obliterated," and, pursuant to such conclusion, to order the Carpenter re-survey of the *entire township* 29 South, Range 20 East, M. D. B. & M., both as to "exterior lines" of the township and as to the "entire subdivisional survey" (Exhibits 8 and 9). This conclusion was

---

[3] As heretofore indicated such finding could not affect intervening rights depending on such survey. Cragin v. Powell, supra.; Knight v. United Land Ass'n, supra; United States v. Morrison, supra; United States v. State Investment Co., supra.

reached on November 29th, 1892. Carpenter was authorized to make the survey on December 28, 1892. His survey on the *entire township* was approved on November 18, 1893, and accepted by the Commissioner of the General Land Office on January 31, 1894.[4]

If, as contended by the Government, all Sections should contain 640 acres, as near as may be, and all excesses or deficiencies should be added to the northern or western tier of sections, then on the re-survey, it would have been a simple matter for the Government to have adhered to Reed's South and East lines of the township and added the overage to the township south of Township 29, and to the township east of Range 20. The land included in Carpenter's re-survey of the Township, which was not included in Reed's survey, was not in any township until Carpenter put it there. The land in question here would thus have fallen into the northerly tier of Sections in Township 30 South, Range 20 East, and into the westerly tier of Sections in Township 29 South, Range 21 East. As indicated, the Government had unquestioned control of the surveys, and instead of adding the additional or "wild" land to the adjacent northern tier of the next township south, or the adjacent western tier of the next Township East, chose to designate the land involved here as being a Section 36. By such designation the Government confirmed the grant to the State of California, as school lands, of the lands designated as Section 36 in the Carpenter re-survey which had not been included in the previous Reed survey. And upon the approval of the Carpenter re-survey the title to such additional land designated as Section 36 therein, immediately passed to the State of California. This conclusion would seem to be inescapable in view of the language of the Acts of Congress involved, and the authority of the cases decided by the Supreme Court, the earliest of which is Cooper v. Roberts, 18 How. 173, 15 L.Ed. 338. Others are reviewed and commented on by Mr. Justice

Hughes in United States v. Morrison, 240 U.S. 192, 36 S.Ct. 326, 60 L.Ed. 599. At page 207 of 240 U.S., at page 331 of 36 S.Ct. of that case, a previous Land Office Decision of December 6, 1887 (6 L. D. 412, 417), is quoted with approval as follows: "That the school grant 'does not take effect until after survey, and if at that date the specific sections are in a condition to pass by the grant, the absolute fee to said sections immediately vests in the state, and if at that date said sections have been sold or disposed of, the State takes indemnity therefor.'" There is no question but that the land in question was in "a condition to pass" to the State, i.e., it was not known mineral land; it was not an Indian, Military, or other reservation; and it was not withdrawn or otherwise disposed of by the United States at the time of or prior to the approval of the Carpenter Survey.

As heretofore indicated, the Government has the power to make surveys and re-surveys, but it cannot by a re-survey or corrective survey deprive anyone of title who has received it in dependence upon the previous survey, Cragin v. Powell, supra, United States v. State Investment Co., supra.[5] Under the authority of those cases, the Government could not now, or on the date of filing the instant suit, have deprived the State, or its successors, of title by making a re-survey of the lands in question, and designating them as other than being within the boundaries of Section 36, or throwing them into the northern and western tiers of the next township southerly and easterly. That would, however, be the effect of conceding that their contention is correct. It would permit the Government to do in this action what it cannot do by a legally made re-survey.

The Government recognizes that intervening rights vest under erroneous or invalid surveys, and that changed or corrected surveys cannot affect such rights. It is doing so in this case, as to the lands in Reed's Section 36, which were put by Carpenter in Sections 25, 26, and 35. The

---

[4] New survey superseded Reed survey and became the official survey. Gleason v. White, 199 U.S. 54, 60, 25 S.Ct. 782, 50 L.Ed. 87; Cox v. Hart, 260 U.S. 427;

43 S.Ct. 154, 67 L.Ed. 332; In re Scott, 172 Cal. 363, 156 P. 872.

[5] See also Churchill Co. v. Beall, 99 Cal.App. 482, 490, 278 P. 894.

thing which vested the title in the State to those lands was the approval of the Government of Reed's Survey, which showed them to be in his Section 36. Cooper v. Roberts et al., supra. It follows just as logically that the lands in question vested in the State when Carpenter put them in Section 36 by his re-survey, and by the approval of that re-survey. If the Government has any right now to quiet title granted to the State for the lands in suit, which are *now* in Section 36, it has just as much right to quiet the title to the lands *not now* in Section 36, but which Reed put in his Section 36. But the Government, as indicated, concedes it cannot do this, because the title vested in the State on the approval of Reed's survey putting them in Section 36 and private rights have intervened. By the same token it cannot quiet title to the lands in question which were legally put in Sections 36, fifty five years ago, and are now in Section 36 and upon which intervening rights have attached to the State of California by the approval of the re-survey in 1894, and to its successors by the deed from the State to Jordan as school lands thirty four years ago.

█ The plaintiff's contention that the School Land Grants are on the same footing as Railroad Land Grants does not seem to me to be well taken. There can be no doubt that Railroad grants being private grants, must be strictly construed. Leavenworth, L. & G. R. Co. v. United States, 92 U.S. 733, 23 L.Ed. 634; United States v. Oregon & C. R. Co., 164 U.S. 526, 17 S.Ct. 165, 41 L.Ed. 541, and cases there cited. But from the cases a different rule is applied as to school land grants to the States. In Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338, the court referred to the grant as a "compact" between the State of Michigan and the United States. In United States v. Morrison, supra, 240 U.S. at page 205, 36 S.Ct. 326, 60 L.Ed 599, the court

had under consideration the school land grant to Nevada, and held that it was the intention that all school land grants to the different states should be considered on the same footing.[6] If that is so, then such grants are not a grant from the sovereign Government, to a subject citizen, but are grants from one sovereign, the United States, to another sovereign, the State, for public, and not private purposes of profit as in the railroad grants, and are not subject to such narrow construction.

█ The plaintiff makes one other contention: that the practice of the Land Office has been to limit the State to 640 acres on re-surveys of Sections 16 and 36, and that hence such departmental construction must be followed by the courts. There are three reasons why this contention cannot prevail: First, the Land Office has not been consistent in such respect as evidenced by Exhibit F-3, attached to plaintiff's brief: second, the language of the Statute is plain and unambiguous (this appears to be the first case of record where an attempt has been made by the Government to quiet title on a survey of excess school sections, and some weight should be given to that fact), and where this is so, the departmental action must yield to the language of the Statute, Houghton v. Payne, 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888; and third, there is no evidence that the State or those claiming under it, contested the limitation of acreage on re-surveys in the instances cited by the plaintiff, or asserted any right to such excess acreage. Surely the State can waive any excess acreage. Here, it did not and does not.

Judgment will be for the defendant, who will prepare Findings of Fact and Conclusions of Law, unless the parties agree that this Memorandum will serve as such Findings and Conclusions under Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A.

---

[6] To the same effect is Heydenfeldt v. Daney Gold & Silver Min. Co., 93 U.S. 634, 638, 23 L.Ed. 995.